# United States District Court
## For the District of Columbia

| | |
|---|---|
| (Civil) | |
| **NORTH CAROLINA RIGHT TO LIFE, INC., et al.,** | |
| *Plaintiffs,* | **Plaintiffs' Response to Motion to Quash Nonparty Subpoena** |
| *v.* | |
| **LARRY LEAKE, et al.,** *Defendants.* | **Case No. No. 5:99-CV-798-BO(3)** |

Plaintiffs North Carolina Right to Life, Inc. ("NCRL"), its political committee North Carolina Right to Life Political Action Committee ("NCRL-PAC") and its independent expenditure committee North Carolina Right to Life Committee Fund for Independent Political Expenditures ("NCRL-FIPE") (collectively "NCRL") respond to the motion to quash lodged by respondents Democracy 21 and the Campaign Legal Center ("amici"). Plaintiffs reserve the right to move to compel production of the documents sought under the subpoenas via separate motion and memorandum of support thereof. Fed. R. Civ. P. 45(c)(2)(B).

## Background

This matter, *North Carolina Right to Life, Inc. v. Leake*, No. 5:99-CV-798-BO(3) (E.D. N.C.), is before the Eastern District of North Carolina after remand from the United States Court of Appeals for the Fourth Circuit, which, in turn, considered the case after its earlier decision was vacated and remanded for further consideration by the United States Supreme Court. In February, the parties filed cross-motions for summary judgment and supporting memoranda. The

**Response to Motion to Quash**                    1

respondents to the subpoenas at issue here filed an amicus brief supporting the defendants'

motion for summary judgment. The amici had had no other participation in the case since its

inception in 1999 and now inject themselves into this litigation at trial level.

Amici's brief explicitly opposed NCRL and focused on one of the three statutes at issue,

N.C. Gen. Stat. 163-278.13, which imposes a $4,000 limit on contributions to organizations that

make exclusively independent expenditures advocating the election or defeat of clearly identified

candidates. Democracy 21 and the Campaign Legal Center argued that, based on the treatment of

contributions to national parties upheld in *McConnell v. FEC*, 540 U.S. 93 (2003), limitations on

contributions to groups such as NCRL-FIPE – limitations never before upheld because such

groups spend their funds for communications completely independently from any candidate – are

now sufficiently justified to survive constitutional scrutiny.[1]

Amici's participation here reflects the reality that the role of an amicus as a neutral

provider of information has become flexible, "from a passive one of providing information to a

more active participatory one." *Wyatt by & Through Rawlins v. Hanan*, 868 F. Supp. 1356, 1359

(D. Ala., 1994). *See also Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982). Accordingly,

where, as here, amici take part at trial level and act "exclusively on behalf of the points of view

taken by [one party]," *Hoptowit*, 682 F.2d at 1260, the weight given their nonparty status for

purposes of weighing the burden of discovery should reflect their enhanced role.

---

[1]The Respondents also retained an expert witness, Thomas E. Mann of the Brookings
Institute, who offered his opinion that based on the Court's holding and the subsequent effect of
*McConnell* on spending in federal elections, groups that make only independent expenditures are
as potentially corrupting as are groups that make direct contributions to candidates. Because his
bias and credibility as a witness is as relevant as that of Democracy 21 and the Campaign Legal
Center, NCRL has served him and the Brookings Institute with subpoenas seeking information
similar to that at issue here.

**Response to Motion to Quash**                2

In March, 2005, after the amici's brief was filed but before responses were due, the New York Post reported that Sean Treglia, a former program officer for the Pew Charitable Trusts ("Pew"), had fairly boasted the year before that Pew and several foundations spent nearly $140 million over the course of a decade as part of an express plan to "reform" campaign finance. *See* Ryan Sager, *Buying Reform*, The New York Post, Mar. 17, 2005 at 33. At a panel discussion at the University of Southern California's Annenburg School for Communications in March, 2004, Treglia revealed that Pew set out in the mid-1990's to effect campaign finance reform according to a well funded, organized plan. A copy of the transcript of Treglia's remarks is attached as EXHIBIT C. Treglia revealed that Pew sought to affect government policy and took a new, more aggressive tack, a practice he called "directive funding." "Instead of sitting back and waiting for the good ideas to come in, Pew decided that it would hire professionals and experts from the field . . . and ask them to go out and find people to advance the goals of Pew." EXHIBIT C, Treglia Trans. at 13. As Treglia pointed, "it's one thing to come up with an idea and write and write about it in a paper. It's another thing to actually go out and drive the public policy debate by strategically placing your money." *Id.*

The three prongs of the plan included: 1) Replacing previous frontal attacks on political action committees' (PACs') activities, unlimited campaign spending, and calls for universally publicly funded campaigns,[2] with an incremental approach[3] and the goals of "a ban on soft

---

[2]As to this point, Treglia candidly admitted public financing of all elections (a proposition still advanced) had no popular support: "Frankly, no one in America was going to support a full public financing bill. It's welfare for politicians." Treglia Trans. at 16.

[3]Treglia revealed that the success of the federal plan was but a beginning. He referred to a "new strategy" formalized around 2002 when "[he] knew that [the BCRA] reform was going to come . . . . but it's unfolding now,  and the things that you're seeing in Washington around

**Response to Motion to Quash**            3

money, new issue advocacy rules, better disclosure, and a stand-by-your-ad provision."*Id.* at 17.

2) enrolling "experts" that will support the reform agenda, and 3) creating the impression of a

widespread popular movement for campaign finance reform regardless of the actual scope of

popular support. *Id.* at 17-18.

Both Democracy 21 and the Campaign Legal Center have received substantial funding

from the Pew Charitable Trusts for campaign finance reform activities. *See* PoliticalMoneyLine

Reports, EXHIBITS A, B. Thus, there is good reason to explore the possibility that Democracy

21, the Campaign Legal Center, and Dr. Mann are not unbiased, credible witnesses or experts in

this case because any objective expertise may have been compromised by funding agreements.

Moreover, any participation in Pew's plans to create the "impression" of widespread calls for

reform is relevant to a key defense in this case.

Accordingly, plaintiffs moved to amend the order scheduling response briefs for the

cross-motions for summary judgment in order to allow discovery that would expose the biases of

the amici and Dr. Mann and discredit the testimony they offer.

The Eastern District of North Carolina found the question of bias raised by the revelations

about Pew and others to be relevant to the issues presented in the underlying litigation and

amended its scheduling order accordingly. *See North Carolina Right to Life, Inc. v. Leake*, No.

5:99-CV-798-BO(3) Order at 2-3 (E.D. N.C. July 15, 2005) ("*NCRL*") ("The need to investigate

the potential biases of those who will offer their expert opinions, both as amici and testifying

witnesses, in a case of such public importance constitutes a sufficient showing of good cause [to

allow additional discovery]").

---

campaign finance reform aren't by mistake." Treglia Trans. at 21.

**Response to Motion to Quash**                    4

## Argument

### I. Respondents Have Not Met Their Burden of Justifying Quashing the Subpoenas.

Respondents here move to quash because, they claim, the requests are "extraordinarily burdensome and overbroad," Resps.' Mem. at 1, because they are "irrelevant to any claim or defense in [the underlying litigation]," *id.*, and because the subpoenas would require disclosure of "privileged or other protected matter." *Id.* at 15.

The burden of establishing that a subpoena duces tecum should be quashed lies with the respondent. *Linder v. Department of Defense*, 133 F.3d 17, 24 (D.C. Cir. 1984); *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 n.28 (5th Cir. 2004). That burden is heavy. *Irons v. Karceski*, 74 F.3d 1262, 1264 (D.C. Cir.1995) (citing *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984). Respondents mistakenly assign the burden to NCRL. Resps. Mot. at 15 (subpoenas should be quashed because NCRL "cannot sustain the burden of justifying their subpoenas"). Respondents also move to "quash the subpoenas in their entirety," Resps.' Mem. at 1, despite the rule that "[m]odification of a subpoena is generally preferred to outright quashing." *Linder v. National Sec. Agency*, 94 F.3d 693, 698 (D.C. Cir. 1996). *See also Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 407 (D.C. Cir. 1984) (expressing similar points).

Under Fed. R. Civ. P. 45(c)(3)(A)(i)-(iv), a court may quash or modify a subpoena if it (1) fails to allow a reasonable time for compliance; (2) requires a person who is not a party to travel more than 100 miles from where the person resides; (3) requires disclosure of privileged or protected matter; or (4) subjects a person to undue burden. *See Wiwa*, 392 F.3d at 817-18; *see also Linder v. National Security Agency*, 94 F.3d 693, 695 (D.C. Cir. 1996) (A district court is

**Response to Motion to Quash**                5

authorized to quash or modify a subpoena if it "subjects a person to undue burden.").

Respondents move to quash for the third and fourth reasons. *See* Resps.' Mem. at 1, (requests are burdensome), 15 (they ask for protected information).

### A. Undue Burden

Whether the subpoena presents an undue burden is determined according to the facts of the case. *Linder*, 133 F.3d at 24. The following factors are considered in determining whether a subpoena presents an undue burden: (1) relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed. *Wiwa*, 392 F.3d at 818, n.31 (citing *Williams v. City of Dallas*, 178 F.R.D. 103, 109 (N.D. Tex. 1998) (in turn quoting *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 49 (S.D.N.Y. 1996)). A court may find that a subpoena presents an undue burden when the subpoena is facially overbroad, *Wiwa*, 392 F.3d at 818, that is, if it is "limited neither by reasonable restrictions on time nor by particular documentary descriptions." *Williams*, 178 F.R.D. at 110. *See also British Int'l Insurance Co., Ltd. v. Seguros La Republica, S.A.*, 200 F.R.D. 586, 591 (W.D. Tex. 2000) (finding a subpoena not facially overbroad where the documents sought were relevant, their scope was limited by time and subject, documents were adequately described and the subpoena was subsequently limited by the party requesting the documents who also offered to pay costs.).

### 1. Relevance of the Information Requested

#### a. The Documents Sought Are Relevant Because They Will Tend to Prove or Disprove Biases and Credibility of the Witnesses and the Evidence They Rely On.

Evidence of the bias of a witness is always relevant. *United States v. Anderson*, 881 F.2d 1128 (D.C. Cir. 1989); *United States v. Turner*, 198 F.3d 425 (4th Cir. 1999). *See also* Fed. R. Civ. P. 26(b)(1) advisory committee's note (2000) (information that could be used to impeach a likely witness, even if not otherwise relevant to the claims or defenses, is properly discoverable).

The amici appear to be biased because they or the groups producing the research data on which they rely may have been funded with the agreement, tacit or overt, that certain results were to be reached or opinions expressed regardless of what the evidence said. As part of the six year plan drafted by Treglia for Pew, he directed money to establish a bank of "experts" to cite as support in Congressional hearings and, ultimately, in the litigation that followed passage of the Bipartisan Campaign Reform Act. Treglia Trans. at 18. The respondents here were active in the debate leading to the passage and the litigation and subsequent upholding of much of the provisions of the BCRA. And indeed, the majority in *McConnell v. FEC* relied on the "substantial empirical record" the plan proposed and funded. Thomas E. Mann, *Juice Worth the Squeeze*, 7 Pew Trust No. 2 Summer 2004 at 2-7. "[I]f you look at the Supreme Court decision," boasted Treglia, "you will see that almost half of the footnotes relied on by the Supreme Court in upholding the law are research funded by the Pew Charitable Trust." Treglia Trans. at 21.[4]

Yet there was ample evidence in the record there to conclude that the research and views

---

[4]For example, the *McConnell* decision to allow regulation of "electioneering communications" rested on the finding that they were the "functional equivalent" of express advocacy. *McConnell v. FEC*, 540 U.S. 93, 206 (2003). That finding was based in large part on evidence of their effect on would-be hearers, provided by reform lobby expert witnesses. *Id.* at 193. *See also* Thomas E. Mann, *Juice Worth the Squeeze* at 2-7 (noting this and the "pivotal role" of foundations in "nurturing the efforts that made possible the new . . . law;" and revealing the Pew Trusts' goals: "to improve disclosure, strengthen enforcement, ban or curtail soft money and regulate issue ads intended to influence elections.").

**Response to Motion to Quash**              7

expressed based on it were unreliable. *See McConnell v. FEC*, 251 F.Supp.2d 176, 307-09 (D.

D.C.) (alternative findings of fact, Henderson, J. concurring in part and dissenting in part)

(finding that the Pew-funded research done there was unreliable because the researchers "sought

to achieve a certain result and therefore sacrificed scientific objectivity," the Pew funds "were

solicited on the basis of the explicit promise that the study would be abandoned midstream if the

results being obtained were not helpful to the cause for more stringent campaign finance

regulation," and "on the promise that the study would be "design[ed] and execute[d]" to achieve

"reform" and the study was so designed and executed.").

Plaintiffs in this case seek documents that would show that the amici's opinions offered

here are unreliable because they are themselves funded or based on research funded with similar

explicit or implicit promises or requirements. The Treglia transcript and information on funding

and sub-funding arrangements noted above give ample reason to suspect that documents exist

showing that the amici's opinions are inherently unreliable because they or researchers providing

data on which they rely sacrificed objectivity in exchange for financial support or because of

their preexisting ideological support for increased regulation of political association and speech.

### b. The Information Sought is Relevant to a Claim, Defense, or the Subject Matter of the Underlying Case.

NCRL's document requests seek documents that are also relevant to a claim or defense in

the underlying case or relevant to the subject matter of the case.[5] The standard for relevance in

---

[5]Under Rule 26(b)(1), there are two categories of discovery: party-controlled and court-ordered.

Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears

determining whether a subpoena imposes undue burden within the meaning of

Rule45(c)(3)(A)(iv) is that of Rule 26(b)(1). *Linder*, 133 F.3d at 24. The federal rules demand no

more relevance for documents sought of nonparties than for documents or other discovery sought

of parties. 9A Wright and Miller, *Federal Practice and Procedure*, § 2459. The information

sought is relevant under this standard.

Evidence of amici's arrangements with Pew and other funding sources is relevant to a

defense in this action. North Carolina (and amici) defend the limit on contributions to

independent expenditure committees by arguing that it is adequately supported by an interest in

averting actual or apparent corruption. *See McConnell v. FEC*, 540 U.S. 93, 185 n.72 (2003) (If

government seeks to constitutionally limit the rights of political speech and association inherent

in contributions, it "must show concrete evidence that a particular type of financial transaction is

corrupting or gives rise to the appearance of corruption and that the chosen means of regulation

are closely drawn to address that real or apparent corruption."). In their brief, amici suggest,

citing evidence offered by Dr. Mann, that unchecked contributions for "supposedly" independent

expenditures pose "the same kind of corruption that was at the heart of the Supreme Court's

analysis in *McConnell*." Mem. of Amici at 17.[6] By suggesting activities are "improper" or

---

reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1). The advisory committee's notes expressly explain that in addition to
"party-controlled discovery in terms of matter relevant to the claim or defense of any party" the
court has authority "to order discovery of any matter relevant to the subject matter involved in
the action for good cause." and "[t]he good-cause standard warranting broader discovery is meant
to be flexible." Fed. R. Civ. P. 26(b)(1) advisory committee's note (2000). The discovery sought
here is allowable under either category.

[6]A copy of which has been attached for the Court's convenience.

**Response to Motion to Quash**                    9

"potentially corrupting," amici suggest actual corruption and create the appearance of corruption supporting the regulation they advocate. Amici effectively offer "evidence" of a condition that gives rise to a substantial interest that would support regulation.

The information sought by the subpoenas, evidence of tacit or overt agreement between amici, experts, and funding sources, is relevant to NCRL 's claim and the state's countervailing defense that the limit on contributions to NCRL-FIPE is closely drawn to a substantial government interest because the existence of agreements would discredit their evidence and testimony of actual or apparent corruption. And even if the information sought is not limited to amici's offer of evidence in this particular matter, it is still relevant to claims and defenses raised, and hence discoverable, because it pertains to other incidents of the same type. Fed. R. Civ. P. 26(b)(1) advisory committee's note (2000). In other words, it is relevant to this litigation to determine whether or not amici agreed here, in the BCRA affair or elsewhere to compromise their objectivity.

Similarly, the information NCRL seeks would show that amici or the evidence they rely upon for their opinions exaggerate the extent of the public call for reform, falsely portraying a situation in a way that gives rise to a substantial government interest and hence, a defense of the challenged regulations. Treglia's plan called to "create an impression that a mass movement was afoot; that everywhere they looked, in the academic institutions, in the business community, in religious groups, in ethnic groups, everywhere people were talking about reform." Treglia Trans. at 18. Pew apparently created the impression to hide their own involvement in garnering support for the BCRA because it thought that Congress would discount the information and views had it

known that Pew was the source. *Id.* at 27.[7] This supports the view that the research and rhetoric sponsored by Pew is suspect because of inherent bias. But inflating support for reform also inflates a government interest supporting regulating campaign finance.

Ginning up the specter of actual or apparent corruption and creating the impression that "everyone" is separately and collectively calling for reform manufactures evidence of public distrust of campaign finance in general and any of its particular practices. And the Supreme Court has recognized that this "erosion of confidence in the system of representative government" gives rise to a substantial government interest. *Nixon v. Shrink MO Gov't PAC*, 528 U.S. 377, 388-90 (2000). So "convey[ing] the impression that [an outcry for reform] was something coming naturally," Treglia Trans. at 28, also creates the illusion of eroding public confidence and falsely strengthens a commensurate substantial government interest in regulating the practice.

The documents sought are relevant to establishing bias, and as the District of North Carolina has aptly observed, the need to investigate the potential biases of amici and testifying witnesses in a case of such public importance weighs heavily in favor of allowing that discovery to unfold. *See Linder*, 133 F.3d at 24 (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 407 (D.C. Cir. 1984) ("Whether a burdensome subpoena is reasonable 'must be determined according to the facts of the case,' such as the party's need for the documents and the nature and importance of the litigation.").

---

[7]"This strategy, I advised Pew that Pew should be in the background. And by law the grantees always have to disclose. But I always encouraged the grantees never to mention Pew, But I always encouraged the grantees never to mention Pew . . ." Treglia Trans. at 15.

**Response to Motion to Quash**                    11

## 2. The Need of the Party for the Documents

NCRL needs the documents sought because they may contain evidence that discredits testimony offered here and elsewhere and that evidence, by its nature, will be found in internal, unpublicized forms.

The amici testify here and elsewhere as to actual or apparent corruption and eroding public confidence in representative government and in doing so establish a government interest that the Supreme Court has repeatedly held suffices to support contribution limits. Their testimony here and elsewhere in cases of substantial public importance make it reasonable for the Plaintiffs to be given access to internal documents from which evidence impeaching that testimony can be gleaned and exposed.

NCRL believes that the documents sought, records of funding and sub-funding arrangements and of inter-organizational communications, candidly record evidence that the expert and amici's testimony here and elsewhere is based on funding agreements rather than objective analysis and is drafted and publicized to coincide with plans to create the impression of wide support rather than with actual events. It is insufficient to review public and published views as amici and the other organizations would not willingly reveal such arrangements. *See* Treglia Trans. at 15 (grantees were specifically instructed to minimize as much as possible the connection to Pew and its plans.). Without discovery, amici and Dr. Mann are allowed to offer evidence on which the case may ultimately be decided without allowing NCRL any "fuel" for "cross examination." *See United States v. International Business Machines Corp.*, 83 F.R.D. 97, 106 (D.N.Y., 1979) ("*IBM*").

**Response to Motion to Quash**                12

### 3. Breadth of Request

"The overbreadth element is but a restatement of the proposition that the relevance of and need for documents sought will bear on the reasonableness of the subpoena." *Id.* A subpoena is overbroad only "[t]o the extent a subpoena sweepingly pursues material with little apparent or likely relevance to the subject matter." *Id.* at 106-07. Here, NCRL has amply demonstrated the relevance of the material to the claims, defenses and subject matter of this case. Documents pertaining to other groups are requested, among other reasons, because "pass through" and sub-funding between groups can camouflage the connection to the Pew plan and the resulting bias and distortions. The time period covered by the subpoena corresponds to that of the Pew plan. "To be sure, the subpoena is broad but not unreasonably so in light of its purpose." *Id.* at 107.

Moreover, on July 22 and July 25, counsel for NCRL met and conferred with counsel for Democracy 21 and the Campaign Legal Center, respectively. Amici voiced their objections to the requests as irrelevant. NCRL asked if any documents requested were directly relevant from their perspective.[8] Both amici maintained that none were. Amici therefore undercut any claim of overbreadth, as they maintain that none of the requests could produce relevant information.

### 4. Time Period

A demand for documents should cover a reasonable time period to insure that the materials desired are sufficiently identified and to confine the search to relevant documents. However, when relevance and need have been demonstrated, "(t)he fact that the materials requested cover an extended period of time and are voluminous will not render the subpoenas invalid . . . ."

---

[8]This claim of complete irrelevance also contradicts the opinion of the judge overseeing the underlying litigation. During their phone meeting, counsel for NCRL advised counsel for the Campaign Legal Center that in his Order amending the schedule, Judge Boyle had opined that the documents, in general, information relevant to showing the bias of amici and Dr. Mann.

**Response to Motion to Quash**                13

*Id.* at 107 (quoting *Democratic National Committee v. McCord*, 356 F.Supp. 1394, 1396

(D.D.C.1973)). As noted above, the time period covered by the subpoenas corresponds with the

time period covered by Pew's plan. It is reasonable to surmise that documents generated during

the time of the plan's express implementation, documents surrounding funding arrangements and

plans for activities, will provide evidence that the groups offering testimony here had

compromised objectivity and were committed to a position despite any contrary data. The time

period of the documents in fact narrows the request by identifying them and adds to their

relevance because it corresponds with the time period relevant to other evidence that suggest

amici and Dr. Mann have compromised objectivity in their testimony here.[9]

### 5. Reasonable Particularity

" [A] subpoena must specify the documents sought with reasonable particularity, because

vague or duplicative demands may cause confusion and disarray in responding to the subpoena."

*IBM*, 83 F.R.D. at 107. "Particularization must be adequate, but not excessive, for the purposes

of the relevant inquiry." *Id.* (internal quotations and citation omitted). The documents sought

here are particularized by their purpose, their subject matter and the audience or speaker. NCRL

has framed them broadly but within narrow categories and often, with reference to specific

projects that research has shown might be purposed to influence public debate and litigation of

campaign finance regulations with only the appearance of objectivity. They relate to other groups

with ties to Pew and/or the campaign finance reform community, other funding sources tied to

the purposes of Pew as revealed by Mr. Treglia, and projects specifically mentioned as being

---

[9]The requests covering the period outside this litigation pertain to incidents of the same
type and are relevant to claims and defenses raised here. Fed. R. Civ. P. 26(b)(1) advisory
committee's note (2000).

**Response to Motion to Quash**            14

funded by Pew. They are not further particularized because the individual identity of the responsive documents is not known until disclosure is made. *Id.*

NCRL has instead limited its requests to documents that research has shown are likely to expose any overt or implied agreements tying funding to research results, experts' opinions on the subject matter of this litigation, or efforts to increase the volume and breadth of calls for more regulation. By their very nature, these documents will adversely affect the efforts of amici, Dr. Mann, Pew, and the campaign finance reform movement in general. Broadly framed requests are therefore needed to avoid the evasion more particularized requests would allow.

Given that large numbers of documents are possibly involved, and that NCRL cannot achieve more particularity where it would allow respondents to avoid potentially harmful but relevant revelations, "common sense dictates that requests framed in terms of categories or types of documents are sufficient." *Id.*

### 6. Burden of Compliance

"[T]he burden of compliance must be compared with the size of and resources available to the responding party." *Id.* at 108. The campaign finance reform community has been reported as spending almost $140 million from 1994-2004, the bulk of which, $123 million, came from eight foundations and was given mainly to seventeen organizations including the amici here. From 1994 to 2004, the Campaign Legal Center received more than $5.5 million in funds earmarked specifically to influence the debate on campaign finance laws, the Democracy 21 Education Fund, $3.7 million. *See* PoliticalMoneyline *Campaign Finance Reform Lobby*, a copy of which is attached as EXHIBIT D. In 2003 alone, the Democracy 21 Education Fund received $610,000 "to support efforts to reform federal campaign finance laws through policy research

**Response to Motion to Quash**                    15

and advocacy, litigation, and public education" and "[t]o ensure the implementation and

enforcement of the Bipartisan Campaign Reform Act of 2002, and to build public support for an

improved federal campaign finance enforcement system." PoliticalMoneyLine *Money in Politics*

*Database: Democracy 21 Education Fund.* EXHIBIT A. They received another $250,000 that

year for "support." *Id.* That same year, the Campaign Legal Center received almost $2.5 million

to "act as people's voice in administrative hearings and proceedings on campaign finance and

media laws,"[10]"support its efforts to educate the public, media, candidates and policy makers

about the merits of free air time."PoliticalMoneyLine *Money in Politics Database: Democracy*

*21 Education Fund.* EXHIBIT A.

Thus, amicis' estimates of the time to be spent responding to the subpoenas must be

viewed in context of rather well-funded organizations, ostensibly with sophisticated

communication networks and infrastructure. Moreover, NCRL offered to pay reasonable copying

costs and to consider responses from amici that were less than what the subpoenas encompassed

on their face. Amici rejected the offer and hence, the actual burden imposed by the subpoenas

was not presented by amici in their motion to quash.

Moreover, where, as here, there is a case of public importance, a substantial burden of

compliance may be justified. *IBM*, 83 F.R.D. at 108. The district court in North Carolina

---

[10]This grant by the Pew Charitable Trusts was given through the University of Utah,
providing one example of sub-funding that would require broader document requests. The
Campaign Legal Center was established by a 2001 grant of more than $2.4 million dollars also
passed through the University of Utah. EXHIBIT B. Other examples include a 2002 grant from
the Pew Charitable Trusts to the Democracy 21 Education Fund through the Annenberg School
of Communications, $399,000 passed through the William J. Brennan Jr. Center for Justice that
same year "for a public education effort on the court challenge to and constitutionality of the
McCain-Feingold law." EXHIBIT A There is also evidence of other sub-funding arrangements,
necessitating wider discovery to discover possible compromising funding arrangements.

**Response to Motion to Quash**            16

recognized and considered the importance of the issues presented in the underlying litigation. Litigation addressing recognized burdens on First Amendment rights is, by definition, of public importance. Evidence that the proponents of additional regulation of the speech and association inherent in campaigns are "buying" data and the impression of widespread support will fundamentally change the public debate and the course of this and other litigation. The cost and burdensomeness alleged here should "give way to the search for truth in this case of undoubted importance to the public weal." *Id.*

## II. First Amendment Privilege.

### A. The Claim of Privilege Is Inadequately Supported According the Rules.

Information withheld on a claim of privilege must be made expressly and must be supported by a description of the nature of the documents not produced that is sufficient to enable the demanding party to contest the claim. Fed. R. Civ. P. 45(d)(2). Failure to sufficiently support a claim of privilege "is deemed to waive the underlying privilege claim." *GFL Advantage Fund, Ltd. v. Colkitt*, 216 F.R.D. 189, 195 (D.D.C. 2003) (internal quotations and citation omitted).

Respondents here assert a First Amendment privilege against disclosure of documents sought. Resps.' Mot. at 15-19. Yet the description they provide of the documents withheld on the basis of this claim is lacking. Respondents assert the conclusion of privilege, *id.* at 16 ("the information sought directly impinges on movants' First Amendment activities"), a general claim of "frontal assault" on "the freedom to protest policies . . . the freedom to organize, raise money, and associate with other like-minded persons so as to effectively convey the message of the protest," *id.* at 17, a sweeping claim that NCRL demands production of documents "reflecting all

or most of their communication with one another and with others, including funders and the

press, as well as federal and state legislators," *id.*, and a conclusion that the subpoenas

"undoubtedly have the intent" of "deterring campaign reform groups." *Id.*

The closest thing to a list of withheld documents is the conclusion that every document

requested "relates to efforts to associate with others to advance beliefs and ideas, influence public

debate, and advocate for changes in public policy and legislation." *Id.* at 17-18. And this critique

of the requests does not meet the requirements of the rule; it implies that every document

responsive to the subpoenas is privileged. The purpose of the required list describing supposedly

privileged documents is to describe them sufficiently so as to give the seeker sufficient

opportunity to contest the claim of privilege. Fed. R. Civ. P. 45(d)(2). While some documents

reasonably deemed to be covered by the requests may arguably come under a First Amendment

privilege, a list of those so claimed as so by Respondents is required precisely so that such a

determination can be made. This case illustrates the need of a descriptive list when claiming a

privilege because it is not apparent how *all* the documents requested fall under the privilege

invoked.

### B. The Documents Requested Do Not Give Rise to a First Amendment Privilege.

Amicis' conclusory claim of privilege for all the documents described both overstates the

scope of the document requests and mistakes the First Amendment's treatment of simple

disclosure. The requests are limited to documents recording contacts between amici with certain

specified groups to or through which funding may have passed or with whom amici may have

discussed funding agreements, and then only for specific projects, and are further limited to

specific content. While Respondents characterize the requests as broadly as possible, in fact the

**Response to Motion to Quash**          18

subpoenas request only those documents recording contacts with certain groups who, research has revealed, participate(d) in specific Pew-funded or related projects, and then seek only those documents related to the projects' funding arrangements, and documents mentioning the substance of activities only insofar as those documents might reveal a funding agreement to reach certain results, and/or an effort to artificially raise the volume of apparent public criticism of current campaign finance laws. While the subpoenas may be forced to include other documents, certainly these are within the ambit of the subpoenas and yet give no rise to questions of privilege. Yet Respondents produced no documents, claiming all were privileged with nothing more than a conclusory paragraph in their memorandum.

Moreover, every transaction covered by the subpoenas, while perhaps related to "efforts to associate with others to advance beliefs and ideas, influence public debate, and advocate for changes in public policy and legislation" is not absolutely protected from disclosure of the source and recipient of the funds utilized. The Supreme Court has made clear at least since *FEC v. Massachusetts Citizens for Life, Inc.,* that simple disclosure is fundamentally different from more burdensome requirements, and disclosure imposes a burden on speech and association that survives heightened scrutiny under the First Amendment. 479 U.S. 238, 265-66 (1986) (O'Connor, J., concurring); *see also McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 355 (1994) (disclosure distinguished from compelled self-identification on election-related writing).

Nor is the disclosure sought here of heightened concern because government agencies seek membership lists, *see NAACP v. Alabama,* 357 U.S. 449, 460-61, or an organization's "'internal communications,'" wherein its decisions 'to support or oppose any individual in any way for nomination or election . . .'are revealed." *FEC v. Machinists Non-Partisan Political*

**Response to Motion to Quash**                 19

*League*, 655 F.2d 380, 388 (D.D. Cir. 1981).[11]

While the district court in *Wyoming v. United States Dep't of Ag.* applied *NAACP*

principles to a case where a state government sought discovery of nonparty documents, the case

still involved state action. 208 F.R.D. 449, 453-54 (D. D.C. 2002). More importantly, the court

there granted non-party witnesses' motions to quash primarily because the information sought,

---

[11]Moreover, the First Amendment concerns in both of these cases stemmed from *government* access to communications and records, not disclosure to private litigants. *See NAACP*, 357 U.S. at 453 ( noting that "[t]he Association both urges that it is constitutionally entitled to resist *official inquiry* into its membership lists, and that it may assert, on behalf of its members, a right personal to them to be protected from *compelled disclosure by the State* of their affiliation with the Association as revealed by the membership lists (emphases added)); *Machinists*, 655 F.2d at 388 (FEC subpoenas gave rise to heightened First Amendment concerns because by them "the government thus becomes privy to knowledge concerning which of its citizens is a 'volunteer' for a group trying to defeat the President at the polls" and "release of such information to the *government* carries with it a real potential for chilling the free exercise of political speech and association guarded by the first amendment." (emphasis added)).

Generally, First Amendment-protected speech and association is chilled by a credible threat of enforcement. *New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996). Discovery of relevant information in a private civil action is not an enforcement action, and NCRL is not a state actor for civil rights purposes simply because it has had subpoenas issued. *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1293 n.2 (and cases cited therein) (11th Cir. 2005) (using the court's legal process does not make one a state actor).

While in *Doe v. 2TheMart.com, Inc.*, 140 F. Supp.2d 1088, 1093-94 (W.D. Wash. 2001), the subpoena of a private litigant was at issue, the First Amendment claim was anonymity. ("In the context of a civil subpoena issued pursuant to Fed. R. Civ. P. 45, this Court must determine when and under what circumstances a civil litigant will be permitted to obtain the identity of persons who have exercised their First Amendment right to speak anonymously."). Anonymity is of a fundamentally different First Amendment concern than the disclosure sought here. *See McIntyre*, 514 U.S. at 355. In addition, in *Doe*, the subpoenas were issued in a shareholder derivative suit in a defense that claimed the changes in stock prices at issue "were not caused by the Defendants but by the illegal actions of individuals who manipulated the . . . stock price using . . . message boards."140 F. Supp. at 1095. Hence, the information sought, the identities of the third parties, was irrelevant. because "[T]he identity of non-parties who had made derogatory comments about the defendant in an internet chatroom. . . . *were immaterial*, because any effect their statements made upon investors took place without knowledge of their identities." *Guerrilla Girls, Inc. v. Kaz*, 224 F.R.D. 571, 574 (D.N.Y., 2004) (emphasis added). Here, the information sought is relevant, as the court in North Carolina has noted.

**Response to Motion to Quash**            20

that of communications with interest groups involved in the process of drafting new federal land

use regulations, was not relevant to the question of whether the federal government violated the

Federal Advisory Committee Act ("FACA"). The information sought could not answer the legal

question of whether the government had established an advisory committee subject to the

FACA.[12] *Id.* at 453-54 (holding that the relevance of the information sought to plaintiff's claim

was the threshold issue and irrelevance meant that the information sought did not go to the "heart

of the lawsuit."). As noted above, the relevance of the information sought here to the bias and

credibility of the witness respondents is recognized by the court hearing the underlying litigation.

And the information sought is relevant to a claim or defense and to the subject matter of the

litigation.

### C. The Requests Meet this Circuit's Test for Weighing First Amendment Concerns in Discovery.

The standard announced in *Int'l Union v. Nat'l Right to Work Legal Defense Fund and

Educ. Found.*, 590 F.2d 1139 (D.C Cir. 1978) is met here. First, the information sought goes to

the heart of the lawsuit. Evidence of the bias of a witness is always relevant. *United States v.

Anderson*, 881 F.2d 1128; *United States v. Turner*, 198 F.3d 425. *See also* Fed. R. Civ. P.

26(b)(1) advisory committee's note (2000). As Judge Boyle aptly noted when considering the

relevance of the information sought here to the underlying litigation, "[t]he need to investigate

the potential biases of those who will offer their expert opinions, both as amici and testifying

---

[12]Wyoming alleged that the USDA violated the FACA in creating new regulations by utilizing an advisory committee, largely made up of the subpoenaed nonparty witnesses, without following at least six provisions alleged to be required by the FACA. But, by law, an advisory committee can only be established by a government agency. Therefore, nothing the groups could have done could establish an advisory committee and make the FACA applicable.

**Response to Motion to Quash**              21

witnesses, in a case of such public importance constitutes a sufficient showing of good cause [to allow additional discovery]"). *NCRL*, No. 5:99-CV-798-BO(3) Order at 2-3.

In cases arising under the First Amendment's protection of political speech and association, it is of paramount importance whether those supplying opinions and information are biased, especially when those opinions give rise to a substantial government interest in averting actual or apparent corruption or addressing eroding public confidence in our system of representative government.

### a. NCRL Sought the Information Through Alternative Means and Made Reasonable Attempts to Obtain the Information Elsewhere.

As noted in their briefing to the North Carolina district court, NCRL invested considerable time and effort to trace the various connections among funders and groups dedicated to campaign finance reform. *See* Resps.' Mot. at 18 (citing one example). Counsel sought and obtained a tape of Mr. Treglia's revelations and had it transcribed and searched publicly filed finance documents such as those attached as exhibits here, as well as dozens of articles, essays, transcripts and web sites. Not surprisingly, amicis' publicly accessible documents do not address the questions of importance here: Did the amici here compromise objectivity as part of their acceptance of funding, and did they agree, tacitly or overtly, to help create the impression that the public wanted reform.

### Conclusion

There is ample evidence that Respondents, as amici in the underlying litigation, have compromised their objectivity as witnesses. The information sought by subpoena here is not available elsewhere, and could reveal whether they have made tacit or overt agreements with Pew

or other funders to offer their opinions in favor of North Carolina or other government seeking to

expand regulation of campaign finance regulation. Respondents' fail to justify the extraordinary

remedy of quashing a subpoena that seeks relevant information to a suit of such public

importance. When analyzed by the applicable standards, the requests do not present an undue

burden to discovery and respondents' claims of privilege are inadequately supported under the

rules and the documents requested do not give rise to a First Amendment privilege.

       Accordingly, NCRL asks that this court deny Respondents' Motion to Quash.

                           Respectfully submitted,

Dated August 17 2005

                         BOP, COLESON & BOSTROM

                         Jeffrey R. Gallant
                         Bar No. 46876 (VA)
                         James Bopp, Jr.
                         Bar No. 2838-84 (IN)
                         1 South 6th Street
                         Terre Haute, IN 47807-3510
                         Ph: (812) 232-2434
                         Fx: (812) 235-3685
                         *Lead Counsel for Plaintiffs*
                         *Pro Hac Vice Motion Filed Aug. 18, 2005*

                         David W. New
                         D.C. Bar # 428046
                         Attorney at Law
                         6701 Democracy Blvd.
                         Suite 300
                         Bethesda, MD 20817
                         301-468-4905
                         *Local Counsel for Plaintiffs*

**Response to Motion to Quash**          23

## CERTIFICATE OF SERVICE

I certify that a copy of the Plaintiffs' Response to Motion to Quash Nonparty Subpoena and the Notification of Local Counsel were sent by first-class mail and by fax on August 18, 2005, to:

Roger M. Whitten (Bar No. 163261)
Tori.T. Kim
WILMER CUTLER PICKERING
HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
P: (212) 230-8800
F: (212) 230-8888

J. Gerald Hebert (Bar No. 447676)
THE CAMPAIGN LEGAL CENTER
1640 Rhode Island Ave., N.W., Suite 650
Washington, D.C. 20036
P: (202) 736-2200
F: (202) 736-2222


_____
Curtis A. New